OPINION
This case presents a combined appeal of two cases from the Mahoning County Court of Common Pleas. Case No. 96-CA-117 involves the timely appeal of a no contest plea which Appellant, Shawn D. Rozier, entered to a charge of drug abuse in violation of R.C. § 2925.11 (A) (C) (1). As Appellant has presented no assignment of error or argument as to Case No. 96-CA-117, this Court will not undertake review of that case. App.R. 12 (A) (2); App.R. 16. Case No. 9-CA-121 regards the timely appeal of a jury verdict rendered in the Mahoning County Court of Common Pleas finding Appellant guilty of one count of murder in violation of R.C. § 2903.02 (A) (B) with a firearm specification, one count of tampering with evidence in violation of R.C. § 2921.12 (A) (1) (B) and one count of felonious assault in violation of R.C. § 2903.11 (A) (2) (B), also with a firearm specification. For the reasons stated herein, this Court affirms the jury verdict of the trial court.
The record in Case No. 96-CA-121 reveals that two women, Maria Rivera and Kristi Gardner, exchanged with Appellant stolen clothing for crack cocaine. Subsequently, late on the evening of December 16, 1995, Rivera and Gardner were left alone in Appellant's apartment at 102 W. Philadelphia, Youngstown, Ohio, where they took some of the clothes that they had earlier traded to Appellant and traded them for more crack cocaine from another drug dealer. After trading the clothes, Rivera and Gardner returned to Appellant's apartment in the early morning hours of December 17, 1995. Appellant forced Rivera and Gardner into his apartment where he struck the two women and held a gun to Rivera's head. Appellant then placed the gun to Gardner's head and fired. Appellant forced Rivera to drag Gardner from the apartment and across the street to an empty garage. There, Appellant shot Gardner a second time.
After dragging Gardner outside, Appellant fired three shots at Rivera when she attempted to flee. His shots having missed her, Appellant chased Rivera. When he caught her, he struck Rivera with the gun. Rivera again fled and was eventually found by police who were notified by a motorist that Rivera, clothed only in pants and a bra, was running down Market Street in Youngstown.
Officers found Gardner and followed a trail of blood to Appellant's apartment. When the officers approached the apartment, Appellant fled. Officers entered the apartment and found blood, a bloody mop and bucket and a .44 caliber revolver. However, police failed to apprehend Appellant.
On December 22, 1995, Kristi Gardner died as a result of gun-shot wounds to her head and to her lower back. Appellant turned himself in to police on January 11, 1996.
At trial, Appellant stated that he returned to his apartment on December 17, 1995, and discovered that items were missing. Appellant testified that he retrieved his gun and investigated noises that he heard in the apartment. According to Appellant, he was entering a utility room when the door swung open and struck him and caused the gun to discharge. Appellant stated that after struggling with an individual, he realized that it was Rivera and Gardner in the room and that the shot struck Gardner. Appellant stated that he and Rivera dragged Gardner outside in order to call for help. Appellant also testified that he thought the cold air would help Gardner by numbing the pain. According to Appellant, while carrying Gardner the gun accidentally discharged again.
Appellant testified that he ran to his sister's house which was nearby to call for help but no one was home. Appellant testified that he returned to his apartment and began to clean up the blood because he could not stand to see his friend's blood in his apartment. According to Appellant, he fled when police arrived because he feared that the police would kill him. Appellant testified that the police fired shots at him.
Appellant was tried and convicted of murder with a firearm specification, tampering with evidence and felonious assault with a firearm specification. On May 31, 1996, Appellant was sentenced to fifteen years to life in prison for murder, with a three year term of actual incarceration for the gun specification to be served prior to and consecutive with the murder sentence. Appellant was also sentenced to two years imprisonment for tampering with evidence, five to fifteen years with an actual incarceration of five years for felonious assault and three years of actual incarceration for the firearms specification, once again to be served prior to and consecutive with the felonious assault sentence. All sentences were to be served consecutively.
On June 26, 1996, Appellant filed his notice of appeal. His first assignment of error alleges:
 "THE TRIAL JUDGE COMMITTED REVERSIBLE ERROR BY FAILING TO INSTRUCT THE JURY ON LESSER INCLUDED OFFENSES AND/OR INFERIOR DEGREES OF MURDER IN LIGHT OF THE EVIDENCE PRESENTED AND UPON DEFENDANT-APPELLANT'S REQUEST."
Appellant argues that the trial court was required to charge the jury on the lesser included offense of voluntary manslaughter because the jury could reasonably infer from the evidence that an element of the greater offense was not established, but that the facts reasonably supported the elements of the lesser included offense. Appellant also argues that the trial court improperly considered the persuasiveness of the evidence in reaching the decision not to instruct on voluntary manslaughter.
Appellant argues that a voluntary manslaughter charge would permit him to mitigate the murder charge by allowing him to establish the mitigating circumstance of sudden passion or sudden fit of rage in response to serious provocation by the victim. Appellant argues that both his own and Rivera's testimony establish extreme emotional stress and that this mitigates Appellant's criminal culpability.
Appellee argues that the court properly denied the voluntary manslaughter instruction because Appellant failed to present sufficient evidence of serious provocation resulting in sudden passion or sudden fit of rage. Appellee cites Appellant's trial testimony to show the lack of serious provocation caused by the victim. Appellee contends that Appellant failed to present sufficient evidence of the mitigating circumstances required by R.C. § 2903.03 (A). Therefore, no reasonable jury could decide that Appellant was reasonably provoked by the victim and the trial judge was required as a matter of law to refuse to give the voluntary manslaughter instruction.
Voluntary manslaughter is an inferior degree of murder, rather than a lesser included offense. State v. Shane (1992), 63 Ohio St.3d 630,632. However, "* * * the test for whether a judge should give a jury instruction on voluntary manslaughter when a defendant is charged with murder is the same test to be applied as when an instruction on a lesser included offense is sought."Id., citing State v. Tyler (1990), 50 Ohio St.3d 24, 37. This test states: "* * * a defendant charged with murder is entitled to an instruction on voluntary manslaughter when the evidence presented at trial would reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter." Id.
This test requires Appellant to present more than "some evidence" that he may have acted in a way that meets the requirements of voluntary manslaughter. State v. Shane, 632. The evidence presented must be sufficient to, "* * * allow a jury to reasonably reject the greater offense and find appellant guilty on a lesser included (or inferior-degree) offense." Id. (emphasis original).
Ohio's voluntary manslaughter statute, R.C. § 2903.03, provides:
 "(A) No person while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another."
In deciding whether the facts demonstrate that the provocation is sufficient to bring on sudden passion or a sudden fit of rage, an objective test must be applied. State v. Shane, 634. The provocation must be reasonably sufficient to, "* * * arouse the passion of a an ordinary person beyond the power of his or her control." Id., 635. Once it is objectively established that the circumstances would cause a reasonable person to act out of sudden passion or rage, the test becomes subjective; whether the defendant before us in this particular case was under the influence of sudden passion or rage. Id., 634. If insufficient evidence of provocation is presented so that no reasonable jury would decide that the victim reasonably provoked the defendant, the trial court must not give a voluntary manslaughter instruction. Id. If the objective test is not met, we need not reach the subjective test. Id.
In evaluating the circumstances, the trial court must, as a matter of law, decide whether the evidence when viewed in a light most favorable to the defendant and without weighing its persuasiveness, warrants the voluntary manslaughter instruction.Id., 637, citing State v. Wilkins (1980), 64 Ohio St.2d 382, 388. An appellate court reviews the totality of the evidence in a light most favorable to the defendant and must determine whether a reasonable jury could have found serious provocation. Id., 638.
In the present case, the trial court properly denied Appellant's request for a voluntary manslaughter instruction. There is insufficient evidence to objectively determine that a reasonable person would have acted out of sudden passion or in a sudden fit of rage. Appellant argues that the fact that Gardner and Rivera were in his apartment without permission and that they had taken items from his apartment was sufficient to cause serious provocation. We disagree.
In the present case, Maria Rivera testified that she and Kristi Gardner had stolen clothes from Appellant's apartment which they had previously stolen and traded to Appellant. (Tr. 239.) Rivera also testified that although Appellant was not present when she and Gardner took the clothing from his apartment, it was Appellant who left them there alone. (Tr. 240.) This dispels Appellant's claim that Gardner and Rivera were in his apartment without his authorization. Under such circumstances, a reasonable person would not be driven to sudden passion or a sudden fit of rage. Appellant was aware that Gardner and Rivera had stolen clothing to exchange for crack cocaine; in fact, Appellant was a participant in just such a scheme. A reasonable person (although hopefully unlikely to be involved in such a scheme) would be fully aware of the risks and ramifications of such an illegal practice and would not be enraged when he falls victim to his own game.
Even if we assume, arguendo, that a reasonable person would have succumbed to sudden passion or a sudden fit of rage under the circumstances, the evidence shows that Appellant was not actually acting under the influence of such passion or rage. In this subjective analysis, we note that conflicting testimony was presented at trial as to the manner in which the shooting occurred, neither version of which supports the contention that Appellant acted out of sudden passion or in a sudden fit of rage.
Rivera testified that when she and Gardner returned to Appellant's apartment after trading the clothes for crack cocaine, Gardner knocked on Appellant's door, he opened it and pulled Gardner inside his apartment. (Tr. 243.) Rivera stated that she waited at the bottom of the steps in the apartment building and heard Appellant ask Gardner where she (Rivera) was at. (Tr. 243.) Rivera testified that Appellant then came down the steps and dragged her up to his apartment where he pushed them into the room and hit and pushed them. (Tr. 243-244.) Rivera also stated that Appellant left the room and returned with a gun. (Tr. 306.) Rivera further testified that after a verbal attack, Appellant placed the gun to her head and said, "* * * maybe I should kill you first, I don't even know who you are." (Tr. 244.) According to Rivera, Gardner stated that she was responsible for taking the clothes, when Appellant began beating Gardner and pushed her against a clothes dryer that he had previously knocked over. (Tr. 244.) Rivera testified that Appellant then pointed the gun at Gardner and fired. (Tr. 245.) Then, according to Rivera, Appellant dropped the gun to his side, pointed it at her (Rivera) and walked out of the room without saying anything. (Tr. 245-246.)
Rivera also testified that Appellant was "mad." (Tr. 245.) However, viewing all of the circumstances, it can not be said that Appellant acted out of sudden passion or a sudden fit of rage. The events were not sudden. Appellant was at the apartment prior to the return of Gardner and Rivera; he did not discover them in the act of taking anything. He left Gardner alone to bring Rivera into his apartment and left both of the women to retrieve his gun. In addition, the shooting did not happen until after he had beaten the two women and threatened to shoot Rivera first. The evidence shows that he made a clear decision to shoot Gardner rather than acting in the heat of passion. Furthermore, the calm manner in which Appellant left the room strongly refutes the contention that he was enraged.
Contrary to Rivera's testimony, Appellant testified that the shooting was an accident. Appellant stated that when he returned home, he noticed that a VCR and some of his personal belongings were missing from his apartment (Tr. 691, 623.) Appellant testified that he believed his neighbors in the apartment building were involved in the purported burglary and he retrieved his gun in anticipation of a confrontation with the neighbors. (Tr. 693.) Appellant stated that as he was leaving his apartment, he heard a noise in the room where the shooting occurred. (Tr. 693-694.) Appellant stated that he was entering the room with his gun pointed at the dryer when the door flung open and struck him, causing the gun to discharge, a shot that hit Gardner. (Tr. 694-695.) Appellant also testified that he was mad that someone had broken into his apartment, but not mad enough to shoot Gardner. (Tr. 775.) Thus, even Appellant's version of events does not support the theory that he was acting out of sudden passion or in a sudden fit of rage.
After reviewing the evidence favorably to Appellant, we conclude that there was insufficient evidence to support a jury instruction on voluntary manslaughter. Appellant's first assignment of error lacks merit.
Appellant's second assignment of error alleges:
 "DEFENDANT-APPELLANT WAS CONVICTED ON INSUFFICIENT EVIDENCE THAT THE MENS REAS REQUIRED TO CONVICT HIM OF THE CHARGES WERE NOT PROVEN BEYOND A REASONABLE DOUBT AND/OR THAT THE VERDICT RENDERED AGAINST HIM WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
In his second assignment of error Appellant argues that the state failed to present sufficient evidence to prove that he acted purposely in shooting Gardner, feloniously assaulting Rivera, or in tampering with evidence. Appellant also argues that for each charge against him, the verdict was against the manifest weight of the evidence.
The Ohio Supreme Court has determined that "sufficiency of the evidence" and "weight of the evidence" are not synonymous legal concepts. State v. Thompkins (1997), 78 Ohio St.3d 380, 386. This Court has held that when reviewing the sufficiency of the evidence to support a criminal conviction, an appellate court must examine the evidence admitted to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v. Demiduk
(June 24, 1998), Columbiana App. No. 96-CO-16, unreported, citingState v. Jenks (1990), 61 Ohio St.3d 259, paragraph two of the syllabus. The relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Id. To reverse a lower court conviction based on legally insufficient evidence, only a concurring majority of the court of appeals panel reviewing the judgment is necessary. State v. Thompkins, 389.
On the other hand, the weight of the evidence:
 "* * * concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. * * *'"
Id., 387, quoting Black's Law Dictionary, (6th Ed. 1990), 1594. We can reverse on the weight of the evidence only after the prosecution has presented both sufficient evidence to support a conviction and has persuaded the fact finder to convict. Id., 388, citing Tibbs v. Florida (1982), 457 U.S. 31, 41-43. To reverse Appellant's conviction based upon the weight of the evidence, we must find that, "* * * the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v.Thompkins, 387, quoting State v. Martin (1983), 20 Ohio App.3d 172,175. For such a reversal, all three judges on the court of appeals panel reviewing the case must unanimously concur. Statev. Thompkins, 389.
Ohio's murder statute, R.C. § 2903.02, provides that, "No person shall purposely cause the death of another." There is no requirement that purpose or intent to kill must be proven by direct testimony. State v. Eley (1996), 77 Ohio St.3d 174, 180. Purpose to kill can be, "* * * deduced from all the surrounding circumstances, including the instrument used to produce death, its tendency to destroy life if designed for that purpose, and the manner of inflicting the fatal wound." Id.
There is sufficient testimony in the present record that, if believed, proves that Appellant purposely caused Gardner's death. Rivera testified that she saw Appellant put the gun to Gardner's head and fire it. (Tr. 245.) Based on this testimony alone, a rational trier of fact could have found that Appellant acted purposely.
With respect to the manifest weight of the evidence, the greater weight of the evidence tips against Appellant. While Appellant testified that the shooting was an accident, his testimony is uncorroborated. On the other hand, Maria Rivera's testimony that Appellant pointed that gun at Kristi Gardner's head and fired is corroborated by a number of experts. Dr. Jesse Giles of the Mahoning County Coroner's Office testified that the wound to Gardner's head was a contact wound; meaning the gun was placed against the skin when fired. (Tr. 187.) Furthermore, Michael Roberts of the Ohio Bureau of Criminal Identification and Investigation testified that the murder weapon was a double action revolver which could have been fired in two different manners. (Tr. 449.) The first manner is that the operator simply pull the trigger which would fire the gun. (Tr. 449.) This manner requires the operator to exert eleven and one half pounds of pressure to fire the weapon. (Tr. 450.) The second manner is that the operator manually retract the hammer which would fall and fire the gun when the operator pulls the trigger. (Tr. 449.) Firing the weapon in this manner requires the operator to exert only three pounds of pressure on the trigger. (Tr. 451.) However, Roberts clarified that to shoot the gun in this manner it takes force to pull back the hammer and that the trigger must still be pulled. (Tr. 465.)
The foregoing testimony supports that the shooting was intentional. The gun was placed against Gardner's head and the trigger was either pulled back and released in two separate motions, or fired by exerting eleven and one half pounds of pressure on the trigger. The greater amount of evidence supports that Appellant intentionally killed Gardner. We can not conclude that the jury lost its way and reached a manifestly unjust result with respect to the murder conviction.
Ohio's felonious assault statute, R.C. § 2903.11, provides that:
"(A) No person shall knowingly
(1) Cause serious physical harm to another;
 (2) Cause or attempt to cause physical harm to another by means of a deadly weapon or dangerous ordnance * * *"
In the present case, Maria Rivera testified that Appellant threatened to kill her and pointed a gun at her head. (Tr. 244.) Rivera also testified that Appellant fired several shots at her as she fled from him. (Tr. 251.) In addition, Rivera testified that Appellant hit her in her head with the gun. (Tr. 256.) As already noted, Rivera was present when Appellant shot Gardner. The Ohio Supreme Court has held that sufficient evidence of felonious assault exists when the defendant fires a shot, hits the victim in the head with a gun and holds the gun to the victim's head. State v. Mills (1992), 62 Ohio St.3d 357, 369. In fact, it has been held that firing a gun in a place where there is a risk of injury to one or more persons supports the inference that the shooter acted knowingly. State v. Owens (1996),112 Ohio App.3d 334, 338. Viewing the evidence in a light most favorable to the prosecution, we conclude that there was sufficient evidence that a rational trier of fact could have concluded that Appellant acted knowingly.
We also conclude that the jury verdict finding Appellant guilty of felonious assault was not against the manifest weight of the evidence. Although Appellant contends that he neither fired his gun at Rivera nor struck her, his testimony is controverted by the greater amount of evidence. As stated earlier, Rivera testified that Appellant hit her and fired shots at her. Such testimony is corroborated by other evidence. Dr. Stephen Frank, the emergency room physician who treated Rivera after the incident, testified that she suffered wounds caused by blows from a blunt object and that a gun could have been used to inflict the injuries. (Tr. 164-165.) Furthermore, a detective found a bullet casing in the area where Rivera stated that Appellant had fired shots at her. (Tr. 379.)
The greater amount of evidence supports that Appellant committed felonious assault. We cannot conclude that the jury lost its way and reached a manifestly unjust result with respect to this charge.
Ohio's tampering with evidence statute, R.C. § 2921.12, provides in relevant part:
 "(A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:
 "(1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation;"
The Ohio Supreme Court has considered whether circumstantial evidence established a defendant's destruction of documents, "* * * for the purpose of impairing their value or availability as evidence * * *" State v. Jenks, supra, 274. The Court held that circumstantial evidence need not preclude a defendant's theory of innocence. Id. The Court stated:
 "* * * it is a fundamental principle that a person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts * * * Intent can never be proved by the direct testimony of a third person and it need not be. It must be gathered from the surrounding facts and circumstances.
Id., 274-275.
In the present case, there is sufficient evidence that when viewed in a light most favorable to the prosecution could sustain the jury's finding that Appellant acted with purpose to impair the availability of evidence. The State presented evidence that police officers saw Appellant in the room where the shooting occurred. (Tr. 63.) The State also presented evidence of a bucket and mop, both containing blood, recovered from the room where the shooting occurred. (Tr. 106.) From this evidence, a rational trier of fact could conclude that Appellant intended to impair the availability of evidence.
We also see from the record that the jury verdict on this charge was not against the manifest weight of the evidence. Appellant testified that he was cleaning up the blood because he could not stand to see it. (Tr. 711.) However, the greater weight of evidence supports that Appellant was destroying evidence. As noted, police found a bloody mop and bucket. In addition, Appellant fled the scene when police arrived. (Tr. 64-65.) Based on the amount of evidence supporting a finding that Appellant was destroying evidence, we can not conclude that the jury lost its way and reached a manifestly unjust result with respect to the charge of tampering with evidence.
For the foregoing reasons, we hold that Appellant's second assignment of error lacks merit. Wherefore, we affirm the jury verdict of the trial court in total.
Cox, P.J., concurs.
Vukovich, J., concurs.
APPROVED:
 __________________________________ CHERYL L. WAITE, JUDGE